1001 PLAYS, INC., Plaintiff

v.

Kevin H. WHITE, Defendant

No. 81-2372

Superior Court
Commonwealth of Massachusetts

9/29/81

## MEMORANDUM OF DECISION

This is an action in the nature of certiorari under G.L. c. 249, sec. 4 seeking an order requiring defendant to approve an application for an entertainment license by the plaintiffs to operate a place of amusement in Allston, which was denied April 22, 1980.

The parties filed a joint pre-trial submission, equivalent to an agreed statement of facts, that the record of the hearing contains the material facts. Briefs which raised a number of issues were also filed.

The case came on for hearing on Friday, September 11, 1981, and during argument both sides conceded that the Boston Code Ordinance 14, Section 426-430, amended in 1978, was controlling and was constitutional with the elimination of its criteria (d), (in substance giving the Mayor the power to deny such applications if he found that the activity would significantly harm legitimate protectable interests of the citizens). Both parties agreed that the sole question before the Court was whether there was substantial evidence on the record to support the finding that the proposed activity violated any of the remaining three criteria.[1]

Counsel were granted until September 18 to file the record and the same arrived and was accepted as an exhibit, as enumerated in defendant's answer, A-a through k.

## APPLICABLE LAW

Chapter 140, Section 181 provides in relevant part that the Mayor may . . . grant . . . a license for . . . public amusements . . . and . . . shall grant such license or shall deny such license upon a

---

[1] The ordinance is based on G.L. c. 140, §181, which, after this hearing, was found unconstitutional by the U.S. Dist. Ct. in **Venuti v. Riordan,** Lawyers Weekly of 9/28/81, their ref. 205. **Venuti** involved speech in the form of nude dancing. Plaintiff in the instant case abandoned at hearing all constitutional challenges.

**Ira Zaleznik,** counsel for plaintiff
**Arlene S. LaPenta,** counsel for defendant

finding that issuance of such a license would lead to the creation of a nuisance or would endanger the public health, safety or order by: (a) unreasonably increasing pedestrian traffic in the area in which the premises are located or (b) increasing the incidence of disruptive conduct in the area in which the premises are located or (c) unreasonably increasing the level of noise in the area in which the premises are located. The ordinance (omitting the agreed-upon improper provision (d) ) tracks the statute.

The applicable test would appear to be found in **Saxon Coffee House v. Boston Licensing Board,** 1980 Mass. Adv. Sh. 1517; **New Boston Garden v. Board of Assessors of Boston,** 1981 Mass. Adv. Sh. 1023; **Konstatopoulos v. Town of Whately,** 1981 Mass. Adv. Sh. 1669, that there must be substantial evidence (based on observations, not conclusions), more than some or any evidence, to support the Board's conclusions, ''such evidence that a reasonable mind might accept as adequate,'' **Saxon Coffee House v. Boston Licensing Board, supra,** at 1528.

Predicting the probable future effect of an activity always involves some measure of judgment and inference. Cf. **Boylston-Washington v. ABCC,** 1979 Mass. App. Ct. Adv. Sh. 1898; **Save the Bay, Inc. v. D.P.U.,** 366 Mass. 667 (1975).

If the inferences, reasonably drawn by the authority, support its conclusion on any of the three legal bases, its decision should be affirmed, since the statute, and the ordinance, are phrased in the disjunctive.

Also, ''a licensing authority generally has considerable discretion to deny a license, and . . . a judge cannot substitute his or her judgment for the board's on a discretionary matter,'' **McDonald's Corp. v. Board of Selectmen of Randolph,** 1980 Mass. App. Ct. Adv. Sh. 97, 99.

## DISCUSSION

The proposed operation involved is to occupy a store of 740 square feet, located near the intersection of Harvard Avenue and Commonwealth Avenue, Allston, to be limited to 16 video games and 26 people inside the establishment at a time.

Exhibit A-a, copy annexed, is the decision of the Licensing Division, dated April 22, 1980, in which the Mayor's delegee, Richard J. Sinnott, relied, with respect to his adverse finding pertaining to **pedestrian traffic** on evidence from Emily Lloyd, testimony from Counselor Langone, and Representatives Galvin and Melia; also letters from Counselors Sansone and DiCara (Exhibit A—page 2).

Sinnott's decision with respect to **disruptive conduct** (phrased in terms of crime and vandalism) was based on evidence from Sergeant Feeney and Chairman of the Boston City Council Public Safety Committee O'Neil (Exhibit A-a—page 3 and 4).

Sinnott's decision with respect to **noise** was based on his own inferences.

It is undisputed that there is very heavy traffic and parking pressure in the intersection in question, that there are nine liquor and entertainment establishments within about one-eighth of a mile with a capacity of 1700 patrons, that there is a good bit of criminal activity in the area including, within six months of the hearing, 15 assaults by means of dangerous weapons, 25 robberies, 8 handbag snatchings and 150 episodes of vandalism. (Exhibit A-h).

## CONCLUSION

I am of the opinion that:

1. The licensing authority on the evidence could and did properly conclude that the proposed establishment would attract a substantial number of young people and, added to the already heavy pedestrian and vehicular traffic, would endanger public health, safety or order by unreasonably increasing pedestrian traffic.

2. The licensing authority on the evidence was reasonable in concluding that the nature of the activity,

superimposed on the entertainment and drinking establishments already in the area, would endanger public health, safety or order by increasing the incidence of disruptive conduct.

3. The evidence did not support the inferences that the addition of this activity would endanger public health, safety or order by unreasonably increasing the level of noise in the area. The sole evidence, other than generalized unsupported conclusory predictions, is that of petitioner's expert Lebow, whose evidence (and the licensing authority did not find it incredible) was to the effect that there would be no increase in noise.

4. The licensing authority's decision was fair and reasonable, and within its discretion. Having properly found two of the three bases of denial, the decision was appropriate.

### ORDER
The prayer for certiorari is consequently denied, and the complaint is dismissed.

**Robert J. Hallisey**
**Justice of the Superior Court**
9/30/81

### Attachment A-a
### CITY OF BOSTON
### OFFICE OF THE MAYOR
### CITY HALL, BOSTON
### LICENSING DIVISION
**April 22, 1980**
Ms. Irene Conti Marks
73 Marathon Rd.
East Arlington, Mass. 02174
Re: Application for an Automatic Amusement Arcade, "1,001 Plays" 1211 Commonwealth Ave., Allston.
**Dear Mrs. Marks:**

As you are aware, for the second time within 17 months a public hearing was held on your application for a license for an Automatic Amusement Arcade at 1211 Commonwealth Avenue. The latest hearing was on Monday, March 10th and lasted from 10:45 a.m. until 1:35 p.m.

Although the new application shows a reduction in the number of machines applied for and the hours of operation reduced from those previously sought, opposition to this facility based on apprehension that it would adversely affect the public health, safety or welfare does not appear to have abated.

As a result of information submitted at that hearing and all evidence adduced, your application for said Automatic Amusement Arcade is denied.

. My findings for denying are based on issues which would adversely affect the public health, safety and welfare, as well as a reiteration by the Traffic and Parking Commissioner of her initial opposition.

Be assured I have carefully reviewed the testimony contained in the transcript of the hearing along with the various letters and petitions admitted at that hearing, concerning your application.

It is my opinion that the application should be denied pursuant to Chapter 9 of the Ordinances of 1978, Section 428, because the granting of a license to "1001 Plays" would "endanger the public health, safety, or order" when measured by the criteria of all four subsections, a, b, c and d, of Section 428.

Subsection "A" concerns a threat to the public health, safety or order by "unreasonably increasing pedestrian or vehicular traffic in the area in which the premises are located." According to Emily Lloyd, Commissioner of the Department of Traffic and Parking, "1001 Plays" would create just such a threat. In a letter to the Licensing Division she points out that the intersection of Commonwealth Avenue and Harvard Avenue, where the applicant proposes to locate, is one of the highest accident locations in the city. She says this is primarily due to the unusual configuration of dual roadways and an offset street car reservation. "It would appear that the amusement center would only increase the pedestrian usage of the intersection by younger people of the area

with a resultant increase in potential pedestrian related accidents,'' Commissioner Lloyd writes.

This concerns with pedestrian and vehicular traffic in the area was also stressed in testimony from Councillor Frederick Langone and Representatives William Galvin and John Melia. It was also a chief concern in letters submitted by Councillors Rosemary Sansone and Larry DiCara, both of whom know the area well.

In addition to the safety factor, I believe the increased vehicular traffic in the area would aggravate an already serious parking problem now plaguing area residents. At the hearing Robert O'Connell, of 85 Fisk Terrace, a property owner, showed slides taken at various times of the day to show that the area could not accommodate an influx of cars without greatly inconveniencing those who live in the area and leading to an increase in the number of illegally parked vehicles.

I am aware the applicant has reduced the size of its operation from that which was envisioned in the October, 1978 application, which was denied by the Licensing Division. The occupancy level has been set at a maximum 26 persons, which is significantly lower than the 72 person limit at ''1001 Plays'' in Cambridge or the 169 person limit at an amusement arcade on Washington Street, Boston. Nevertheless, I feel this operation would still lead to a problem with crowds. If anything it may create more problems due to its small capacity in terms of potential patrons waiting on the street for access.

Problems of crowd control lead to consideration of the second way in which granting of a license to ''1001 Plays'' would endanger the public health, safety and order. Subsection ''B'' deals with ''increasing the incidence of illegal or disruptive conduct in the area in which the premises are located.'' This concern with crime and vandalism was the one voiced

most frequently at the hearing. Through his testimony at the hearing and by means of a letter submitted to the Licensing Division, Detective-Sergeant James J. Feeney of District Fourteen presented an impressive array of statistics on the crimes committed in the area surrounding the applicant's proposed location over a six month period commencing September, 1979.

These ranged from 100 arrests for serious crimes (rape, robbery, assault) to approximately 130 incidents of vandalism to residential and commercial property.

Sergeant Feeney also pointed out that abutting the proposed amusement arcade there are nine liquor and entertainment establishments with a total capacity of 1700 patrons, and that there are in the general area an additional seven liquor and entertainment establishments with a capacity of 1,000 patrons. As a representative of the Boston Police Department, it is Detective Sergeant Feeney's view that the granting of a license to ''1001 Plays'' would result in ''. . . an aggravation of the present problem of late-night crime and rowdiness that disrupts an area, already overcrowded and also congested with youth-oriented bars and other establishments.''

In opposition to granting the license on the grounds of its threat to the public safety, we also heard from Councillors DiCara, Langone and O'Neil, who is chairman of the Boston City Council Public Safety Committee.

Concern was also voiced by Irene Lisker, Acting Manager of the Allston-Brighton Little City Hall, Brian Gibbons, President of the Allston-Brighton Community Beautification Council and Calvin M. Johnson, Executive Director of the Area 11 Home Care for Senior Citizens, which services 800 of the 12,000 senior citizens in Allston-Brighton.

It should be noted that no drinking or gambling is allowed at ''1001 Plays.'' Indeed the applicant has offered petitions signed by patrons of ''1001 Plays'' in

Cambridge and letters from neighboring businesses which state that the establishment in Cambridge is well run and has not created the threat to public safety which is the concern of so many Allston-Brighton area residents.

However, I do find that the Putnam Avenue area in Cambridge and the Harvard Avenue area in Cambridge and the Harvard Avenue area are very different, despite the attempt to establish similarities between the two areas by means of the Comparative Site Survey conducted by Harry McCrensky of Letterman, Inc. I believe the main difference lies in the proliferation of liquor and entertainment establishments geared to the youth crowd. Subsection "B", perhaps more than any other of the criterion in Section 428 rests on speculation, for how can one predict an establishment will lead to an increase in crime. Our only recourse is to seek expert opinions. Toward that end I rely on the expertise of Detective Sergeant Feeney and the other civic leaders who are intimately acquainted with and who have a deep concern for the welfare of that area.

Subsection "C" of Section 428 concerns a threat to the public safety caused by "unreasonably increasing the level of noise in the area in which the premises are located." The applicant offered the testimony of Frederick Lebow, an accoustical consultant. According to Mr. Lebow, the 16 machines to be installed in "1001 Plays" could not be audible outside the building, due to the level of noise already existing on the street.

Even allowing for this observation, the noise from patrons waiting for access outside the building would still appear to be a potential problem. The arcade, I believe, would provide yet another location for crowds to loiter in an area already saturated with liquor and entertainment establishments.

Another major concern to the city is how the granting of a license to "1001 Plays" would effect the attempted revitalization of this area. This would seem to come under subsection "d", which addresses threats to the public welfare by "otherwise significantly harming the legitimate protectable interests of the affected citizens of the city."

Clergy, State Representatives, City Councillors, neighborhood leaders, private citizens all spoke of the concern that the blight in this area be stopped and that it be made once more a pleasant and safe place to live. They see "1001 Plays" as falling within the same category of liquor and entertainment establishments that are credited with contributing to the area's decline. It cannot be ignored that the majority of those who testified at the hearing on behalf of "1001 Plays" were young people who are not likely to be long term residents of the area and, therefore, have less of an investment in its future.

And finally, David Treitch of the Boston Redevelopment Authority went into considerable detail as to what the future of the area is to be.

The intersection of Harvard and Commonwealth Avenue, he said, is to be a focal point of a four million dollar urban systems project to rehabilitate the area. Also, a Commercial Area Revitalization District (CARD) designation is planned for this area, which will include incentives for commercial investment in the area.

The area is also to be improved under the City's Restore Program, managed through the Neighborhood Business Program and local merchant's and residents. This program will provide rebate incentives for facade improvements. The aim of all these programs is to decrease the flood of transients now using the area and to return it to its former status as a stable residential neighborhood and solid business area.

I do not deny your professed good motives in seeking to open this establishment. However, given the overwhelming

nature of the evidence discussed above, it is my decision that the application of "1001 Plays" for a license be denied.

Very truly yours,
Richard J. Sinnott, Chief
Licensing Division
Mayor's Office

rjs;nv